# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION

| | |
|---|---|
| CARPETERIA MARKARIAN CO., on behalf of itself and all others similarly situated,<br><br>               Plaintiff,<br><br>   v.<br><br>HICKORY SPRINGS MANUFACTURING COMPANY, VALLE FOAM INDUSTRIES, INC., DOMFOAM INTERNATIONAL, INC., THE CARPENTER COMPANY, THE WOODBRIDGE GROUP, FLEXIBLE FOAM PRODUCTS, INC., SCOTTDEL INC., FOAMEX INNOVATIONS, INC., FUTURE FOAM, INC., VITAFOAM PRODUCTS CANADA LIMITED, VITAFOAM, INC.<br><br>               Defendants. | **Case No.  5:10-cv-185**<br> **Related to 5:10-cv-111**<br> **MDL No. 2196**<br><br><br><br><br><br>**CLASS ACTION COMPLAINT** |

Plaintiff, CARPETERIA MARKARIAN CO., on behalf of itself and all others similarly situated, based on personal knowledge, the investigation of his counsel, and on information and belief, brings this action for damages and injunctive relief for price fixing under Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. §1, and the antitrust laws of the United States against defendants Hickory Springs Manufacturing Company, Valle Foam Industries, Inc., Domfoam International, Inc., The Carpenter Company, The Woodbridge Group, Flexible Foam Products, Inc., Scottdel Inc., Foamex Innovations, Inc., Future Foam Inc., Vitafoam Products Canada

Limited, and Vitafoam Inc., who are or were operating in the United States polyurethane foam market beginning at least in 1999 and continuing to the present.  Plaintiff, CARPETERIA MARKARIAN CO., alleges:

## NATURE OF THE ACTION

1.      This case stems from a conspiracy among Defendants and co-conspirators to fix the price of polyurethane foam and polyurethane foam products ("foam") as admitted by Vitafoam to the United States Department of Justice's Antitrust Division as part of its attempt to seek acceptance into the Antitrust Division's Corporate Leniency Program.

2.      This case is brought as a class action on behalf of all persons and entities (the "Class") who purchased foam from Defendants during the period between at least 1999 to present (the "Class Period").

3.      As alleged herein, defendants conspired with each other to fix, maintain, or charge plaintiffs inflated prices for foam.  All known price increases during the class period were a result of the conspiracy among defendants.

4.      Defendants conspired to allocate customers among each other.

5.      Defendants' illegal conduct, in violation of Section 1 of the Sherman Act directly and proximately caused the Class to pay artificially high prices for foam that the Class would not have paid but for Defendants' unlawful behavior.  Thus, the Class has suffered financial injury as a direct result from Defendants' unlawful anti-competitive behavior.

## PLAINTIFFS

2

6.      Plaintiff, CARPETERIA MARKARIAN CO., and all other similarly situated (collectively "Plaintiffs") are all individuals and entities who purchased polyurethane foam from Defendants from 1999 to present.

## DEFENDANTS

7.      Defendants refers collectively to the following polyurethane foam manufacturers: Hickory Springs Manufacturing Company; Valle Foam Industries, Inc.; Domfoam International, Inc.; The Carpenter Company; the Woodbridge Group; Flexible Foam Products, Inc.; Scottdel Inc.; Foamex Innovations, Inc.; Future Foam, Inc.; Vitafoam Products Canada Limited; Vitafoam, Inc.

8.      Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a North Carolina corporation with its headquarters located at 235 2nd Avenue, NW, Hickory, NC 28601.  Hickory Springs sold foam throughout the United States during the Class Period.  It was founded in 1944 and is one of the largest components manufacturers and suppliers for furniture and bedding industries in the nation with over 60 facilities domestically and internationally. Hickory Springs has more than 160 flexible foam formulations and is one of the United States' largest producers of foam.  The company stocks and distributes more than 6,000 supply items.

9.      Defendant Valle Foam Industries, Inc. ("Valle") is privately owned and operated with its corporation headquarters located at 4 West Dr., Brampton, ON L6T 2H7.  During the Class Period, Valle directly and/or through its control of its affiliates sold foam throughout the United States.  Valle manufactures slab stock foams for the furniture, bedding, packaging, carpet and children's toy industries.

10.    Defendant Domfoam International, Inc. ("Domfoam") is a subsidiary of Valle Foam Industries, with its headquarters located at 8785 Langelier Blvd., Montreal, Quebec, H1P 2C Canada.   Domfoam sold foam throughout the United States during the Class Period. Domfoam is Canada's largest foam manufacturer.  Domfoam is a manufacturer/wholesaler of sponge and polyurethane foam.  It was established in Montreal, Quebec, Canada and was incorporated in 1963.  Domfoam has "grown to be Canada's leading and most diversified manufacturer of ether, ester, rebounded flexible polyurethane foams and visco-elastic foam.  In its 260,000 square-foot Montreal plant, Domfoam services the demanding urethane market in Canada and in the USA by meeting the toughest industry standards and requirements." Domfoam services the following foam fields: mattresses, sponge foam blocks, carpet cushion, pillows, bolsters, convolute, furniture foam, toppers, anti-static foam, anti-microbial foam, visco-elastic foam, camping foam, sporting goods.  Additionally, Domfoam "manufactures a diverse array of polyurethane foam products and is currently part of the Valle Foam/Domfoam/A-Z Sponge & Foam Products/Qualifoam group."

11.    Defendant The Carpenter Company ("Carpenter") is a privately owned and operated company with its headquarters located at 5016 Monument Avenue, Richmond Virginia, 23230.  Carpenter was founded in 1948 and is currently the largest manufacturer of comfort cushioning in the world.   Its products include: air filter media, bedding, carpet cushion, chemicals, chemical systems, consumer products, expanded polystyrene systems, flexible foam packaging, furniture, molded manufacturing, polyester fiber, and tire products.

12.    Defendant The Woodbridge Group ("Woodbridge") is a Canadian corporation with its headquarters located at 4240 Sherwoodtowne Blvd., Mississauga, Ontario, L4Z 2G6, Canada.  Woodbridge sold foam throughout the United States during the Class Period.  It was

founded in 1978 and currently operates with more than 60 facilities throughout North America, South America, Europe, and Asia Pacific. Woodbridge produces automotive components, commercial and recreational vehicle components, technical foams, building products, protective packaging, and diversified products.

13.     Defendant Flexible Foam Products, Inc. ("Flexible Foam") is a privately owned and operated Ohio company with its headquarters located at 12575 Bailey Road, Spencerville, Ohio 45887 and operations in Texas, Indiana, Florida and Wisconsin. It is a subsidiary of Ohio Decorative Products, Inc., also of Spencerville, Ohio. Flexible Foam sold foam throughout the United States during the Class Period. It services customers "coast-to-coast and in over 15 countries" by providing foam products "for a variety of industries such as bedding, furniture, packaging, novelty, consumer products and automotive applications."

14.     Defendant Scottdel Inc. ("Scottdel") is a privately held corporation with its headquarters located at 400 Church Street, Swanton, Ohio 43558. Scottdel sold foam throughout the United States during the Class Period. It was incorporated in 1943 and began manufacturing bonded urethane carpet cushion in 1961. Scottdel delivers cushion in a 14 state area from Minneapolis to Baltimore.

15.     Defendant Foamex Innovations, Inc., formerly known as Foamex International, Inc. ("Foamex"), is a privately owned and operated company with its headquarters located at Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, PA 19063-2076. Foamex sold foam throughout the United States during the Class Period. Its foam is used in products for the home, healthcare, electronics, industrial use, personal care and transportation markets as well as automotive cushioning, shipping packages, beds and furniture, as well as

5

personal electronics.  Foamex also provides components for filters, dispensers, gaskets and seals for a variety of products.

16.     Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated company with its headquarters located in 1610 Avenue N., Council Bluffs, IA 51501.  Future Foam sold foam throughout the United States during the Class Period.  It began producing foam in 1958 for the furniture industry.  Currently, Future Foam has five plants producing foam for bedding, foam blocks, carpet cushions, furniture, and packaging.

17.     Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its headquarters located at 150 Toro Road, North York, Ontario M3J 2A9, Canada.  Vitafoam Canada either directly or through its affiliates sold foam throughout the United States during the Class Period.  It manufactures foam for use in furniture, bedding and automotive applications, packaging, medical, industrial and memory foams as well as latex mattresses and topers.  Vitafoam has six fabrication facilities throughout Canada.

18.     Defendant Vitafoam Inc. ("Vitafoam Inc.") is a privately owned and operated company with its headquarters located at 2215 Shore Drive, High Point, NC 27263.  Vitafoam Inc. sold foam either directly or through its affiliates throughout the United States during the Class Period.  It was founded in 1991 and has foaming plants in the United Kingdom, Europe, the United States, Canada, Africa, the Far East, and Australia.  It operates as a subsidiary of British Vita Group S.A.R.L.  It produces a plethora of foam products.    Vitafoam Canada and Vitafoam Inc. are hereinafter referred to collectively as "Vitafoam."

Vitafoam manufactures plastic netting, automotive products, general trade, and nonwoven products.  It produces mattresses and pads, convoluted pads, wheelchair components,

and protective packaging for medical supplies, as well as positioning and support wedges, and immobilizing devices, such as neck bracing pillows for the home and commercial healthcare industries.  The company offers polyurethane foam products for packaging, furniture, and upholstery industries; marine industry products, such as fenders, drainable boat seats, waterproof cushions, air circulation pads, and filtration devices; and foam for fabric producers, laminators, trim companies, and original equipment manufacturers in the automotive industry.  It also provides laminating materials, such as fabrics, flexible polyurethane foam, nonwoven webs, films, and other substrates, as well as carpet underlay for residential and commercial sectors. Vitafoam also serves medical, marine, technical, bedding, lamination, and carpet underlay industries.

## CO-CONSPIRATORS AND AGENTS

19.     Other natural persons, corporations, and entities not named as defendants herein, have participated in the unlawful conspiratorial activity alleged herein in violation of the antitrust laws of the United States.

20.     Whenever in this Complaint reference is made to a statement, or transaction of any corporation or entity, the allegation means that the corporation or entity acted, stated, or transacted by or through its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. §§ 15, 26.

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C.        § 1331 which states in relevant part "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.  Because the Sherman Act is a federal statute, this court has subject matter jurisdiction.

Furthermore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1337 which states in relevant part that the "district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."  Here, the Sherman Act intends to protect trade and commerce from restraints and monopolies that artificially hinder free markets.  Thus this court has subject matter jurisdiction.

Finally, this court also has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15, 26 which state in relevant part the amount of recovery shall be for "any person […] injured in his business or property by reason of anything forbidden in the antitrust laws" who may "sue therefor in any district court of the United states in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee"; and "any person, firm, corporation or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws."  Here, Plaintiffs have been injured as a direct result of Defendants' unlawful conduct in violation of antitrust laws and are accordingly entitled to sue for and have injunctive relief in this court.

22.     Venue is proper in this district pursuant to 28 U.S.C. § 15, 22, and 26. Furthermore, venue is also proper under 28 U.S.C. § 1391 (b), (c) and (d) because at all times

relevant to the Complaint, (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this district; (b) a substantial part of plaintiff's claims occurred in this district; (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

23. This court has *in personam* jurisdiction over each of the defendants because, *inter alia*, each of the defendants: (a) committed acts in furtherance of the conspiracy alleged herein in this district and directed the unlawful conspiracy through persons and entities located in this district, including fixing the prices of polyurethane foam sold to purchasers in this district; (b) transacted business in polyurethane foam and other products in this district; (c) maintain and have maintained continuous and systemic contacts with this district over a period of years; (d) purposefully availed itself of the benefits of doing business in this district. Accordingly, each of the defendants maintains minimum contacts with this district more than sufficient to subject it to service of process and sufficient to comply with due process of law.

## FACTUAL ALLEGATIONS

### Foam Market

24. Polyurethane foams are used to insulate objects or reduce shock. Polyurethane foam refers to different types of foam consisting of polymers made of molecular chains bound together by urethane links. They are formed by reacting a polyol (an alcohol with more than two reactive hydroxyl groups per molecule) with a diisocyanate or a polymeric isocyanate in the presence of suitable catalysts and additives. Because a variety of diisocyanates and a wide range of polyols can be used to produce polyurethane, a broad spectrum of materials can be produced

to meet the needs of specific applications.[1]  Furthermore, other additives such as stabilizers, dyes, fire retardants, and fungicides may be added to meet specific performance demands.  Also, auxiliary blowing agents, such as hydrofluorocarbons, liquid carbon dioxide, and acetone are also typically used to prepare the foam.

25.     Polyurethanes exist in a variety of forms including flexible foams, rigid foams, chemical-resistant coatings, specialty adhesives and sealants, and elastomers.  They can be flexible or rigid, but generally have a low density.  Rigid polyurethane foams are used as insulation for buildings, water heaters, refrigerated transport, and commercial and residential refrigeration.  These foams are also used for flotation and for energy management.  Flexible polyurethane foams are used as cushioning for carpet and in upholstered furniture, mattresses, and automobiles.  They are also used for packaging.

26.     To manufacture foam for cushioning, two basic procedures are used.  In one, the chemical mix is poured onto a moving conveyor, where it is allowed to react and expand.  Sides on the conveyer allow the foam to rise into a "bun" or slab anywhere from two to four feet high.  The continuous slab is then cut, stored, and allowed to cure for up to 24 hours.  This manufacturing process is the "slabstock" production process.  The cured foam is subsequently fabricated into useful shapes.  Most foams for use in furniture and bedding are produced this way.  A second method, foam molding, is a process where individual items are produced by pouring foam chemicals into specially shaped molds and allowing the foam reaction to take place.  This process is used primarily for automotive cushioning (such as seats, armrests, and

---

[1] Center for Polyurethanes Industry, Center for the Polyurethanes Industry of the American Chemistry Council, *How is Polyurethane Made?*, *available at* www.polyurethane.org/s-api/doc.asp?cid=853&did=3488.

headrests), although some contract furniture utilizes molded cushions.  This foam is sometimes referred to as "semi-flexible."

27.    Flexible foams have mainly open cells, formed by gas bubbles that have popped.  Air can pass through the foam easily, resulting in a soft, resilient, flexible material.  In rigid foams, most of the ells stay closed.  The material is thus harder and les resilient.  Controlling the proportion of open cells to closed cells during the production process is one of the ways that the properties of foam can be manipulated, adding to the material's versatility.  Flexible foam is widely used for its qualities: it is light-weight, resilient, quiet, low odor and resistant to mildew and other triggers of common allergies.  Flexible foam may also be molded and cut.  More than 1.2 billion pounds of foam are produced and used every year in the United States.

28.    Rigid polyurethane foam has many relevant applications in construction.  Many odd and detailed shapes such as sculptures and domed ceilings are far easier to make with foam than with wood.  Some manufacturers sell specialty rigid foam that is used to replace wood in carved signs and three-dimensional topography models.  It is also used as home insulation, rigid boat hulls, tennis racket grips, and surfboards.

29.    There are few acceptable alternatives for foam.  In furniture and bedding applications, short staple polyester fiber or cotton may be used, but both alternative materials have poor height recovery characteristics after compression.  Steel springs also recover well, but must be insulated from the user with some type of cushioning material.  According to the Polyurethane Foam Association, "comparing [polyurethane foam] to alternative materials in the areas of economics, comfort potential, ease of use, and durability, there is not an acceptable substitute for polyurethane foam."

30.     In 2010, domestic revenue for the polyurethane foam industry is expected to be approximately $12 billion.  Furniture and furnishings account for 36.7% of industry revenue.  The major products in this segment include pillows, seating, cushioning, mattress cores and quilt rolls.  Transportation products account for 19.1% of the industry revenue.  This segment includes foam used for automotive seating, protective cushioning and sound insulation in cars and light trucks.  Building and construction account for 12% of industry revenue.  Packaging products account for 5.3% of industry revenue.  Major packaging products include protective shipping pads and food containers.

31.     Recently, the industry has been consolidating and major players within the industry have been actively acquiring smaller companies and other competitors over the past 10 years.  For example, in 2007, Defendant Carpenter acquired its European competitor, Dumo NV.  Carpenter owns approximately 16.3% of the market share in the industry.

32.     In 2006, after its parent corporation was acquired, Vitafoam sold one plant to Olympics Product, LLC, a joint venture between Woodbridge and Hickory Springs.  It sold another plant to Flexible Foam Products.

33.     Collectively, Defendants alleged here to be participants in the conspiracy constitute most of the major North American foam producers and together represent a significant portion of the United States market.  Furthermore, there is virtually no importation of these products into the United States because of prohibitive freight costs involved in transporting these bulky, low unit priced products over long distances.

## Defendant Vitafoam's Admission of a Conspiracy

34.     In February 2010, on information and belief, Vitafoam voluntarily approached the U.S. Department of Justice, Antitrust Division, to self-report evidence of illegal antitrust activities among itself and other companies and individuals in the industry ("competitors") and to seek acceptance into the Antitrust Division's Corporate Leniency Program.  Since that time, Vitafoam and its employees have been cooperating with this investigation.

35.     As a result of its application, on information and belief, Vitafoam has received a conditional leniency letter from the DOJ's Antitrust Division.  This fact, in and of itself, is significant.  It means that Vitafoam has admitted to participation in a conspiracy to violate the antitrust laws.  The significance of obtaining a conditional leniency letter was explained by Scott D. Hammond, Deputy Assistant Attorney General for Criminal Enforcement, in a November 19, 2008 presentation available on the DOJ's website at:

http://www.usdoj.gov/atr/public/criminal/239583.htm:

> *Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?*

> Yes.  The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction.  Thus, *the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter.*  Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

> When the model corporate conditional leniency letter was first drafted, the Division did not employ a marker system.  Thus, companies received

13

conditional leniency letters far earlier in the process, often before the company had an opportunity to conduct an internal investigation. However, the Division's practice has changed over time.  The Division now employees a marker system, and the Division provides the company with an opportunity to investigate thoroughly its own conduct.  While the applicant may not be able to confirm that it committed a criminal antitrust violation when it seeks and receives a marker, by the end of the marker process, *before it is provided with a conditional leniency letter, it should be in a position to admit to its participation in a criminal violation of the Sherman Act.*  The Division may also insist on interviews with key executives of the applicant who were involved in the violation before issuing the conditional leniency letter.  *A company that argues that an agreement to fix prices, rig bids, restrict capacity, or allocate markets might be inferred from its conduct but that cannot produce any employees who will admit that the company entered into such an agreement generally has not made a sufficient admission of criminal antitrust violation to be eligible for leniency.  A company that, for whatever reason, is not able to willing to admit to its participation in a criminal antitrust conspiracy is not eligible for leniency.*  Previously the model conditional leniency letters referred to the conduct being reported as "*possible* […price fixing, bid rigging, market allocation] or other conduct violative of Section 1 of the Sherman Act." (emphasis added).

## Industry Meetings

36.    On information and belief, representatives of Defendants have regularly met through such organizations as the Polyurethane Foam Association ("PFA"), the International Sleep Products Association ("IPSA"), and Surfaces, a trade group which includes polyurethane carpet underlay producers.

37.    As previously stated, representatives from defendant companies reached agreements at these industry meetings held in the United States and abroad.

38.    Representatives of defendants used these trade association meetings as nothing more than "meet-and-greet" sessions with their competitors.

14

39.     On information and belief, representatives of defendants disguised their attendance at these events as information gathering and merely used them as an opportunity to fix prices and divvy up their customers in person.

## ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

40.     Plaintiff had no knowledge of the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, prior to disclosure of Vitafoam's cooperation with the DOJ.

41.     Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiffs.  These violations constitute injurious acts which restart the applicable statute of limitations.

42.     In addition, defendants' and their co-conspirators' agreement, understanding and conspiracy in violation of the antitrust laws was kept secret.  As a result, Plaintiff and the Class members were unaware of defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for polyurethane foam throughout the Untied States throughout the Class Period.  Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

43.     Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because defendants and their co-conspirators used deceptive and secret methods to avoid detection to affirmatively conceal their violations.

15

44.     Neither defendants nor their co-conspirators told Plaintiff or other class members that they were fixing prices and allocating customers, or engaging in the other unlawful collusive practices alleged herein.  By its very nature, defendants' and their co-conspirators' conspiracy was inherently self-concealing.

45.     Defendants and their co-conspirators engaged in a successful price-fixing and customer allocation conspiracy, which they affirmatively concealed:

a.      By meeting secretly (including use of private telephonic communications) to discuss prices, customers, and markets of polyurethane foam sold in the United States and elsewhere;

b.      By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

c.      By using first names and initials on written communications to disguise their source;

d.      By holding secret meetings outside and separate from the formal trade association meetings defendants were publicly attending;

e.      By disguising price-fixing meetings and communications as technical and operational meetings;

f.      By using fax machines at publicly available outlets to disguise the source of faxes.

**ANTITRUST INJURY**

16

46.     The unlawful contract, combination and/or conspiracy alleged above had and is having, *inter alia*, the following effects:

        a.     Prices charged by defendants and their co-conspirators to plaintiff and the members of Class for polyurethane foam products were maintained at artificially high and supracompetitive levels;

        b.     Plaintiff and members of the Class were required to pay more for polyurethane foam than they would have paid in a competitive marketplace unfettered by defendants' and their co-conspirators' collusive and unlawful price-fixing; and

        c.     Plaintiff and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for polyurethane foam.

47.     During and throughout the period of the contract, combination or conspiracy alleged above, plaintiffs and members of the Class directly purchased polyurethane foam in the United States.

48.     Plaintiff and the other Class members paid more for the polyurethane foam than they would have paid under conditions of free and open competition.

49.     As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, plaintiff and the members of the Class were injured and financially damaged in their businesses and property, in amounts that are not presently determined.

50.     This is antitrust injury of the type that the federal laws were meant to punish and prevent.

## **CLASS ACTION ALLEGATIONS**

17

51.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the proceeding paragraphs of this Complaint.

52.     Plaintiff brings this action on behalf of itself and the members of the Class comprising: All persons or entities which purchased polyurethane foam directly from Defendants or their unnamed co-conspirators from January 1, 1999 to the present.  Excluded from the Class are governmental entities, Defendants, their co-conspirators and their representatives, parents, subsidiaries and affiliates.

53.     Plaintiff brings this action on its own behalf and as a class action under Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the Class.

54.     Due to the nature of the trade and commerce involved, plaintiff believes the Class numbers in the thousands, the exact number and identities being known only by Defendants.

55.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

56.     Class members are identifiable from information and records in the possession of Defendants.

57.     There are questions of law and fact common to the Class.  These common questions relate to the existence of the conspiracy alleged, and to the type and common matter of injury sustained as a result thereof.  The questions include but are not limited to:

a.    Whether defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize the price charged for polyurethane foam sold in the United States;

b.    The identity of the participants in the conspiracy;

c.    The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by defendants and their co-conspirators in the furtherance of the conspiracy;

d.    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.    Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of plaintiff and other members of the Class;

f.    The effect of defendants' conspiracy on the prices of polyurethane foam in the United States during the Class Period; and

g.    The appropriate measure of damages sustained by plaintiff and other members of the Class.

58.    Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of other members of the Class, and plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff bought polyurethane foam directly from one or more of defendants.  Plaintiff's interests are aligned with, and not antagonistic to, those of the other

members of the Class.  In addition, plaintiff is represented by competent counsel experienced in the prosecution of class action antitrust litigation.

59.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

60.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

61.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

62.    The conduct of defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of the United States, in that *inter alia*:

a. Defendants and their co-conspirators have sold polyurethane foam throughout the United States;

b. Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell polyurethane foam throughout the United States;

c. In furtherance of the conspiracy alleged herein, defendants have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

d. The conspiracy alleged herein has affected billions of dollars of commerce.  Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by plaintiff and other entities who are themselves engaged in commerce.

## **CLAIM FOR RELIEF**

### **For Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act**

63. Plaintiff re-alleges and incorporates each and every allegation set forth above as if fully written herein.

64. From a date unknown, but beginning at least as early as 1999 and continuing through the present, defendants and their co-conspirators have combined, conspired and/or contracted to restrain interstate trade in violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

65. In furtherance of the unlawful conspiracy, each of defendants and their co-conspirators has committed over acts, including, *inter alia*:

a.      agreeing to charge prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices of polyurethane foam sold in the United States;

b.      communicating with co-conspirators regarding prices to be charged for polyurethane foam;

c.      agreeing to allocate customers;

d.      meeting with co-conspirators in order to keep the existence of the conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

e.      refraining from competing by refusing to offer polyurethane foam at prices below the agreed-upon fixed price.

66.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of polyurethane foam.

67.    Plaintiff and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damage sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

68.    The conduct of defendants and their co-conspirators constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## **PETITION FOR RELIEF**

WHEREFORE, plaintiff petitions that:

A.      The Court determine that this action may be maintained as a class action under Rule 23 of Federal Rules of Civil Procedure, that plaintiff be appointed class representative and that plaintiff's counsel be appointed as counsel for the Class.

B.      The contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.      Judgment be entered for plaintiff and members of the Class against defendants, jointly and severally, for three times the amount of damages sustained by plaintiff and the Class as allowed by law, together with the costs of the action, including reasonable attorneys'' fees, pre and post-judgment interest.

D.      Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

   i.      Continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

   ii.      Communicating or causing to be communicated to any other person engage din manufacture, distribution or sale of polyurethane foam except to the extent necessary in connection with a bona fide sales transaction between the parties to such communications.

E.      Plaintiff and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

23

## **JURY DEMAND**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury trial of all issues triable by jury.


DATED this 30th day of November, 2010.


By  s/ Larry McDevitt
     Larry S. McDevitt, NC #5032
     David M. Wilkerson, NC #35742
     The Van Winkle Law Firm
     11 North Market Street
     Asheville, NC 28801
     Telephone: (828) 258-2991
     Facsimile: (828) 257-2767
     lmcdevitt@vwlawfirm.com
     dwilkerson@vwlawfirm.com

     Ralph B. Kalfayan, Esq., SBN 133464
     KRAUSE, KALFAYAN, BENINK & SLAVENS, LLP
     625 Broadway, Suite 635
     San Diego, CA 92101
     Tel:  (619) 232-0331
     Fax:  (619) 232-4019

     *Attorneys for Plaintiff*